## JORDAN vs. DEATON.

A party seeking to enforce a specific performance of a contract, must allege and prove a readiness to perform his part of the agreement.

A contract in reference to the sale of lands, to be specifically performed, must be certain in its term, and mutual—an obligation on the part of one to sell and on the other to purchase.

It is well established that proprietors of adjacent properties may, by parol agreement, establish an arbitrary dividing line between them, and acquiescence in such agreement will make it good; or an agreement may be inferred from acquiescence, and occupation according to the line; and this, though one of the parties be only a settler upon public land of which he afterwards becomes the proprietor.

Where one proprietor of adjoining lands points out to the other a particular line as the boundary between the two tracts—assures him that it is the true line—encourages him to make a permanent settlement on the land by acquiescence and assistance in the improvements, it would be inequitable to permit him to assert a claim to the land covered by the improvements, though it should prove by a subsequent survey to be his own land.

*Appeal from Clark Circuit Cou·t in Chancery.*

Hon. LEN B. GREEN, Circuit Judge.

GALLAGHER & KNIGHT, for the appellant.

FLANAGIN and WATKINS, for appellee.

Mr. Justice FAIRCHILD delivered the opinion of the court.

On different occasions from about the beginning of 1851, till in 1854, Deaton, the appellee, is shown to have pointed out and spoken of the Browning line to Jordan, as the established line between sections eighteen and nineteen, in township six south, of range twenty-two west. Deaton owned the southwest quarter of section eighteen, and Jordan had bought and was living on an improvement that approached to the Browning line, but which was thought by Deaton and by others to be on section nineteen. After these assurances to Jordan, relying upon the information, he erected a dwelling house and out houses upon or near the site of the old house, which was part of the improvement he bought, and Deaton was present at the raising of each of the buildings. In the spring of 1854, Jordan was raising a kitchen, and Deaton, among other neighbors, was assisting him. It was suggested to Jordan that he was making improvements that he might not hold, and that an old survey had made the line between sections eighteen and nineteen fall south of the houses, when Deaton, who heard the conversation, said that the Browning line was the established line between him and Jordan, that he had had it run, and believed it to be the correct line, but if it should ever turn out

45

that the true line would throw the improvements of Jordan upon his own land, that he should only expect the entrance money for the land that might be taken into the south-west quarter of section eighteen. After the kitchen was raised, Jordan entered the north-west quarter of section nineteen, though as long before as the spring of 1851, he had declared his intention to Deaton, and William Tucker, and Jonathan Strawn, to enter forty acres to include his building site and improvements. Jordan, also, after the conversation at the raising of the kitchen in 1854, made additional improvements on the northern line of his possessions, by completing the kitchen, clearing, fencing and cultivating land, and planting a peach orchard.

It is charged in the bill that, in 1855, Deaton procured Clingman to run the line between sections eighteen and nineteen, and the answer admits the fact without any date, the result of which was to fix the line south of Jordan's houses and improvements, which is now admitted by all parties to be the true line. After Clingman ran the line, Deaton does not appear to have recognized the claim of Jordan, or to have assented to any relinquishment of his own right, but in March, 1856, commenced an action of ejectment against Jordan to recover the whole of the south-west quarter of section eighteen according to its established lines, having previously refused to receive from Jordan an amount of money he tendered to Deaton as the entrance money for the land that Clingman's line showed to belong to section eighteen.

Such are the principal facts that are established in the case made by the original bill, the supplemental bill of September 1859, the answer to them, and the testimony adduced by the parties. The question arising upon these facts, is, whether Deaton should be enjoined by a court of chancery against having the benefit of a legal prosecution to recover the land covered by Jordan's improvements, such being the case made by the original bill, or against the execution of a judgment for

the land, as is the case presented by the supplemental bill of September 1859.

After Deaton began his action of ejectment, Jordan filed the bill in this case, and obtained an injunction against its further prosecution, which was dissolved on motion of Deaton upon his answer. The suit at law then proceeded to final judgment, which was brought to the notice of the court by a supplemental bill. ·

The bill cannot be supported by a decree of specific performance. The contract which is insisted on as one that should be performed by Deaton, is to recognize the Browning line as the southern extent of Deaton's claim, and for the land south of it in section eighteen, to receive from Jordan its entrance money. The quantity of land between the Browning line and the correct line is twenty-nine 62–100 acres, and it is left uncertain by the testimony whether thirty or thirty-five dollars were offered to Deaton by Jordan, as the entrance money for the land. In either case, if the land cost at the land office a dollar and a quarter an acre, the largest sum would not be sufficient to indemnify Deaton for the purchase money paid by him; and although Jordan states in his bill that he brings fifty dollars into court for Deaton's purchase money and interest, there is no evidence to show that this sum would be sufficient for its designed purpose. To have secured a specific performance, Jordan should have alleged and proved that he had always been ready to perform his part of the agreement, and that, before the suit and in proper time, he had done all that he should do under the contract to induce its performance by Deaton.

The alleged agreement of Deaton was not certain enough, in its terms, to insure its specific performance against him, for he did not say that he would sell the land for the entrance money, or any other sum, only that if section eighteen should take in the houses and improvements of Jordan, he would not require any more of Jordan than the entrance money. He might not require even that, or any amount—might take no step to get possession, under his title, of the land between the

lines,.and yet refuse to sell the land, and be within the meaning, and, it may be, within the spirit of his assertions. Nor was there such mutuality between the parties as to make a certain and sure contract. For Jordan was not bound from anything we can see in the record to buy from Deaton the land that might fall into section eighteen below the Browning line. It might be expected that he would prefer the land and his improvements upon it to the entrance money, but a contract to be specifically enforced must stand upon its own express provisions, and not upon inferences, though ever so reasonably and forcibly drawn. It is proved by Jordan's witness that he made no reply to Deaton's declaration, that if the line ever embraced the improvements, he should only expect, or require the entrance money: nor was there any agreement or expressed expectation that another attempt would be made to establish a line.

Then, without regard to the statute of frauds, or to the sufficiency of the allegations upon which to make a decree of specific performance, this point is disposed of on the ground that no such agreement is proved as courts of equity will require to be specifically performed.

Another and more plausible point made for Jordan is, that Deaton, by his words and by his acts, as before narrated, has so recognized the Browning line to be the line between sections eighteen and nineteen as to establish it as the correct line between him and Jordan, although it was not the one delineated by the public surveys.

It is well established that proprietors of adjacent properties may, by parol agreement, establish an arbitrary line, to be the dividing line between them; and acquiescence in such agreement will make it good; or an agreement may be inferred from acquiescence and occupation according to the line. No written agreement, no consideration need be shown; the implied assent to the line by the respective occupancers to it will be sufficient for its establishment. *Blair vs. Smith*, 16 *Misso. R.* 280; *Rockwell vs. Adams*, 6 *Wend.* 469; *McCormick vs. Barnum*, 10 *Wend.*

110. The distinction, however, between those cases and this, is, that Jordan was not a proprietor of the land adjacent to that of Deaton, in section eighteen, but a settler upon public land. There are a series of decisions by the Supreme Court of Tennessee recognizing and applying the same doctrine as that found in the cases already cited, which are reviewed and confirmed in *Wilson vs. Hudson*, 8 Yerg. 406; in which it is applied to the owner of land, and to one who is about to make an entry of adjoining land. And this court, in *Baker vs. Hollobaugh*, 15 *Ark*. 325, conceded that occupiers of public land, in view of its immediate purchase, or of its purchase when it should come into market, might so agree by parol, or act respecting a division of the land, as to entitle one to relief against the other who would not abide by the contemplated division. And although, in that case, specific performance seemed to be the mode of relief that was asked of the court, and of which the court was then remarking, the concession might as well be applied to the settlement of a boundary line different from any marked by the surveys, when made in anticipation of a purchase of public land.

Besides the difficulty of considering Jordan to be a party to a settlement of a boundary line without being the owner of land next to the proposed boundary, or without evidence that he was ascertaining the line with the purpose of making an entry, all the acts of Deaton that are brought up against him— as his encouragement to Jordan to build, his presence and aid in the erection of his buildings, and his acquiescence in the settlement of Jordan, and even his declarations about the Browning line—seem to relate only to the improvements of Jordan, and not to refer to fixing a permanent boundary by the Browning line, disconnected with the conditions of Jordan's residence and occupancy, which did not extend through the length of the line between the two adjacent quarters in sections eighteen and nineteen. We do not think that any fact in the case calls for a settlement upon the Browning line as the

line between the parties, any further than the improvements of Jordan may extend with the line.

But to hold that Deaton, may recover the improvements, after encouraging Jordan to make his settlement permanent, by his declarations about the Browning line, by his acts of acquiescence and assistance in the improvements, which Jordan was pushing on from 1851 to 1855, would be a reflection upon the administration of justice. The doctrine of equitable estoppel must be applied to Deaton against any benefit from his judgment in ejectment. If a man, by encouraging the sale of his own land, shall be estopped from afterwards questioning the right conferred by the sale, so ought Deaton's mouth to be closed against the assertion of a claim to the land occupied by the improvements of Jordan. The land was as much Deaton's in 1851, in 1854, and the intermediate period, as after Clingman's survey: and the means of ascertaining the true line were as accessible to Deaton then, as in 1855. Not as a matter of contract, but to do equity while asking it, Jordan ought to pay Deaton the entrance money of the land covered by the improvements. And so we direct that Deaton be perpetually enjoined from enforcing his judgment in ejectment against Jordan, so as to deprive him of his improvements along the southern line of the south-west quarter of section eighteen, township six, south of range twenty-two west, and that Jordan pay to Deaton, as above expressed. The decree of the Clark Circuit Court in chancery is reversed, and the case is remanded to ascertain the extent of the injunction, and to render a decree in accordance with this opinion.

The supplemental bill of September, 1858, is to be dismissed. Jordan has no claim to the land on the west side of the east line, between the south-east and south-west quarters of section eighteen, as traced by Marsh, the county surveyor. That the south half of the section contains more than three hundred and twenty acres, does not give Jordan a right to run his line westward from the south-eastern corner of the section, more than half a mile. The excess in the quantity falls into the south-

west quarter, it being upon the western division in the township. On account of this bill Jordan must pay half the costs in the Circuit Court.